***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Gregory. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission modifies and affirms the Opinion and Award of Deputy Commissioner Gregory.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between plaintiff and defendants on April 28, 2000.
3. As of April 28, 2000, the carrier on the risk for defendant-employer was The Hartford Insurance Group.
4. Plaintiff's average weekly wage as of April 28, 2000 was $428.27 per week, yielding a compensation rate of $285.51.
5. The defendants gave notice of payment without prejudice to plaintiff as a result of an injury on April 28, 2000 through I.C. Form 63 filed on or about June 21, 2000, and by the corrected I.C. Form 63 filed on or about July 27, 2000. The defendants did not contest the compensability of plaintiff's injury within the period allowed by N.C. Gen. Stat. § 97-18, and defendants have paid plaintiff temporary total disability and temporary partial disability benefits for all periods of time that he was out of work or on light duty at reduced wages through the date of the hearing before the Deputy Commissioner.
6. Plaintiff returned to full duty work for the defendant-employer on November 1, 2000, and has continued to work for the defendant-employer, at earnings not less than his average weekly wage at the time of the injury, through the date of the hearing before the Deputy Commissioner.
7. The parties stipulated into evidence Stipulated Exhibits #1 and #2 consisting of plaintiff's medical records, I.C. forms, pleadings and an order filed by the Deputy Commissioner on February 27, 2003.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 57 years old with a date of birth of July 28, 1945. Plaintiff was working for defendant-employer performing "webbing" work or "springing up" work in Lenoir, North Carolina.
2. Prior to his employment with defendant-employer, plaintiff sustained an injury to his back while employed with another employer in the 1980s. As a result of that injury, plaintiff was treated for back problems, including left-sided disk complaints. While plaintiff was out of work for approximately several months, he was treated conservatively and upon recovery he returned to work full-duty.
3. Plaintiff began working for defendant-employer on approximately July 18, 1994. Plaintiff performed various duties necessary in the production of furniture. For approximately four years prior to his injury, plaintiff had been performing work "springing up" during which springs and rubber are fitted for and placed into the bottom of a seat cushion for furniture.
4. On Friday, April 28, 2000, while working for defendant-employer in the "spring up" division, plaintiff was injured when he stepped on a pipe and twisted his ankle while lifting and moving a chair. Plaintiff reported the injury to his supervisor on Monday, May 1, 2000, at which time he was instructed to seek immediate medical treatment from Dr. David Abernethy, M.D., at Caldwell Industrial Medicine.
5. On May 1, 2000, plaintiff reported to Dr. Abernethy with complaints of left buttock pain and radiating symptoms into his lower leg and ankle after catching his foot on a pipe at work while moving a heavy chair. Plaintiff informed Dr. Abernethy of his history of back injuries. Dr. Abernathy found no swelling or bruising of plaintiff's ankle and no pain on inversion or eversion. Accordingly, Dr. Abernethy did not note a problem with plaintiff's ankle but instead tentatively diagnosed plaintiff with a discogenic problem, recommended physical therapy, restricted plaintiff to sedentary work, and referred him to Dr. C. Michael Nicks, an orthopaedic specialist, for further evaluation.
6. On May 3, 2000, plaintiff sought treatment from Dr. Nicks. Plaintiff reported back and leg pain extending to his ankle after turning a 90-pound chair and slipping and catching the chair in an awkward position. Dr. Nicks conducted a full physical examination of plaintiff including obtaining x-rays of his low back, which revealed degenerative disk disease of the lumbar spine. Dr. Nicks diagnosed plaintiff with probable left leg radiculopathy, and instructed plaintiff to return to light-duty work pursuant to restrictions that he not bend, stoop, twist, engage in prolonged walking or driving, or lift more than 5 pounds.
7. On May 23, 2000, plaintiff returned to Dr. Nicks' office with complaints of persistent left leg and low back pain and symptoms of his left foot numbness. Dr. Nicks removed plaintiff from work and ordered an MRI of his lumbar spine. The MRI results confirmed the x-ray indications of disc degeneration at L3-4, L4-5, and L5-S1, but they also revealed the presence of a herniated disk and a free fragment at L5-S1. Based on these findings, Dr. Nicks referred plaintiff to Dr. Jeffrey A. Knapp, a spine specialist.
8. On June 7, 2000, plaintiff was first seen by Dr. Knapp. Plaintiff reported a back injury while turning a 90-pound chair and catching it in an awkward position but again failed to disclose his history of prior back injury. After conducting a full examination and reviewing plaintiff's MRI film, Dr. Knapp diagnosed plaintiff with a herniated disc at L5-S1, and advised him of his surgical and non-surgical treatment options. Plaintiff opted to proceed with the surgery recommended, which consisted of a lumbar microdiskectomy at the L5-S1 level.
9. On June 23, 2000, Dr. Knapp performed a lumbar laminotomy and diskectomy on plaintiff's low back at the L5-S1 level. Plaintiff improved greatly with surgery and, on July 7, 2000, Dr. Knapp noted that all of plaintiff's leg pain had resolved and that he was experiencing only a minimal amount of paresthesias in his foot. Plaintiff continued to remain out of work but was instructed to stretch and walk daily while he was recuperating. On August 8, 2000, plaintiff returned to Dr. Knapp with some recurring back pain with activity and continued foot paresthesias without any leg pain. Dr. Knapp recommended reconditioning with a therapist and kept plaintiff out of work.
10. On September 5, 2000, plaintiff returned to Dr. Knapp and reported gradual improvement with therapy with some continued paresthesias and weakness but no leg pain. Therefore, as of September 11, 2000, Dr. Knapp allowed plaintiff to return to light-duty work for four hours per day with restrictions against bending and lifting more than 10 pounds. Dr. Knapp also entered plaintiff into a work hardening program to strengthen his back and improve his functional capacity in the workplace, which resulted in some intermittent symptoms with increased activity. However, Dr. Knapp continued plaintiff at the previous restrictions. On September 14, 2000, plaintiff returned to Dr. Knapp reporting continued aches and dysesthesias aggravated by activity; however, plaintiff reported that his severe pain had been relieved by the surgery. Dr. Knapp did not recommend further intervention and scheduled a gradual return to work and a Functional Capacity Evaluation (FCE) for plaintiff in order to assess his overall work potential. The FCE results revealed that plaintiff was capable of performing at a "medium capacity work".
11. On November 9, 2000, plaintiff returned to Dr. Knapp who found that plaintiff's condition was relatively the same. Plaintiff reported performing light duty work and experiencing some axial back pain and weakness. Dr. Knapp reviewed plaintiff's FCE, determined that plaintiff had reached maximum medical improvement, released him to return to full-duty work with permanent restrictions against lifting more than 25 pounds, provided him with a 10% permanent partial impairment rating to the back, and released him to return on an "as needed" basis. However, plaintiff did not return to Dr. Knapp until April 9, 2003 after an order of the Commission filed February 27, 2003. In addition, plaintiff has continued to work full time for defendant-employer since approximately November 9, 2000 in a modified "spring up" job where he has been provided a lift to assist with his 25-pound lifting restriction.
12. Following his November 9, 2000 release from Dr. Knapp, plaintiff did not seek further medical treatment for any back complaints until he contacted defendant-carrier's adjuster Bonnie Foster apparently seeking an MRI due to his residual complaints. Ms. Foster informed plaintiff of his right to a second opinion on the rating with a physician of his choosing but did not authorize an MRI, which had not been recommended by any physician. Accordingly, on March 6, 2001, plaintiff sought a second opinion on his rating from Dr. John de Perczel, an orthopaedic specialist. Plaintiff was examined by Dr. de Perczel, however, no medical records were available for his review. Plaintiff reported a history and symptoms consistent with his treatment and reports to Dr. Knapp. Specifically, plaintiff reported undergoing surgery, which significantly improved his pain, however, plaintiff reported residual pain and weakness in his leg after standing all day or with heavy use. Dr. de Perczel found minimal weakness of the lower extremity. Dr. de Perczel concurred with Dr. Knapp's assessment that plaintiff had reached maximum medical improvement, but provided plaintiff with a 15% permanent partial disability rating to the back. Dr. de Perczel did not recommend that plaintiff seek any additional medical treatment or diagnostic testing despite the fact that plaintiff requested an MRI.
13. After his second opinion evaluation, plaintiff continued to work full-time with defendant-employer, in a position consistent with Dr. Knapp's restrictions, and earning the same or greater wages as he was earning at the time of his April 28, 2000 injury without missing any time from work due to any residual complaints. Furthermore, plaintiff failed to seek any medical treatment whatsoever for his alleged low back and left leg pain during this time period. Accordingly, on July 8, 2002, over a year after the second opinion on the rating, defendants filed a Form 33 requesting a determination of plaintiff's permanent-partial impairment. Thereafter, plaintiff continued to work full-time with defendant employer without seeking any additional medical treatment until approximately seven months later when, on February 4, 2003, plaintiff filed a Request for a Further Medical Opinion, seeking an MRI and an independent medical examination of his back. As plaintiff had not been evaluated by any physician since March 2001 or by his treating physician since November 2000, Deputy Commissioner Gregory entered an Order on February 27, 2003, holding plaintiff's Motion in abeyance pending a return visit to Dr. Knapp for an assessment of plaintiff's current condition and the hearing on this matter.
14. On April 9, 2003, plaintiff returned to Dr. Knapp for further evaluation of his activity-related low back pain and pain and numbness in his left leg and foot. Plaintiff reported to Dr. Knapp that he was unable to be as active. This report is consistent with the hearing testimony of plaintiff and plaintiff's girlfriend, Mary McDonald. However, plaintiff's residual symptoms were consistent with a successful outcome as expected by Dr. Knapp and had not interfered with his ability to work or caused him to return to Dr. Knapp at an earlier date. In fact, plaintiff had not returned to Dr. Knapp since November 2000 and plaintiff had continued to work for defendant-employer in the spring up job without missing any time despite any residual complaints.
15. Dr. Knapp examined plaintiff and found his condition to be similar to that of November 2000 with continued residual dysesthesias. Dr. Knapp found no further treatment options and no substantial changes in plaintiff's condition. As such, Dr. Knapp did not change plaintiff's work restrictions, alter his permanent partial disability rating, or recommend any additional diagnostic testing of plaintiff. Dr. Knapp suggested that plaintiff use over-the-counter pain medications for continued symptoms. Dr. Knapp would have considered ordering additional diagnostic tests, including another MRI, if he had observed any remarkable changes in plaintiff's pain level or condition, or felt that such testing was necessary. Furthermore, Dr. Knapp felt that such testing was unnecessary as plaintiff was not a candidate for fusion surgery, which would be the only reason to obtain another MRI. Dr. Knapp had the benefit of the pre-surgery MRI, which documented abnormal findings at levels above and below plaintiff's level of previous surgery at L5-S1, which abnormality would have prevented any benefit from a fusion. Furthermore, considering plaintiff's level of functioning, namely medium level work, fusion surgery would not be reasonably necessary to effect a cure, provide relief or lessen the period of disability. Dr. Knapp is an expert in his field and is in a unique position to determine the necessity of further treatment or testing for plaintiff. Accordingly, his opinion is afforded great weight by the Full Commission.
16. Following the re-evaluation by Dr. Knapp and the subsequent hearing on April 22, 2003, plaintiff independently sought unauthorized diagnostic testing and medical treatment from Dr. Scott McCloskey, M.D., a neurosurgeon. Prior to his initial appointment with Dr. McCloskey, plaintiff obtained an updated MRI that revealed disc space narrowing at L4-5 and L5-S1, which was consistent with the indications of degenerative disc disease present on his 2000 MRI film. The 2003 MRI results did not reveal a recurrent disc herniation at L5-S1 and plaintiff was diagnosed with degenerative disc disease, which was advanced at the level of the previous surgery, L5-S1.
17. On June 13, 2003, Dr. McCloskey conducted an examination of plaintiff, reviewed his recent MRI film, and reviewed his medical records from Dr. Knapp and Dr. Nicks. Plaintiff reported improvement from the surgery in 2000 but residual symptoms. Plaintiff also reported working full-time. Dr. McCloskey found no definite weakness and no atrophy. Plaintiff had some sensory loss in the L5-S1 pattern and positive straight leg raising at 60 degrees. Thereafter, Dr. McCloskey diagnosed plaintiff with left-sided residual lumbar radiculopathy, and recommended that plaintiff undergo several additional diagnostic studies, including a myelogram, a post-myelogram CT scan, EMG studies, and nerve conduction studies. This diagnostic testing was unauthorized and not recommended by either Dr. Knapp or Dr. de Perczel.
18. On July 24, 2003, plaintiff underwent a lumbar myelogram and a post-myelogram CT scan on July 24, 2003. Thereafter, plaintiff returned to Dr. McCloskey on October 27, 2003 at which time it was noted that plaintiff continued to experience residual symptoms. However, the additional diagnostic tests failed to reveal any abnormalities correlating with plaintiff's symptoms. Dr. McCloskey ordered a discogram to determine if plaintiff was a fusion candidate and also recommended a tarsal tunnel evaluation and neurophysiological studies designed to evaluate plaintiff's left leg lumbar radiculopathy. Again, plaintiff continued to work full-time with defendant-employer performing work in the spring up division without missing any time for his residual complaints.
19. On December 5, 2003, plaintiff again returned to Dr. McCloskey's office with essentially no change in his reported symptoms. Dr. McCloskey conducted a full physical examination of plaintiff and reviewed the results of the discogram and the neurophysiological studies. The discogram did not reproduce plaintiff's complaint and the neurophysiological studies were normal without any evidence of nerve entrapment or pathology. Dr. McCloskey, like Dr. Knapp, explained to plaintiff that while surgery is beneficial, sometimes recovery is not complete. Dr. McCloskey concurred with Dr. Knapp in all respects except with regard to plaintiff's rating. Dr. McCloskey determined that plaintiff was at maximum medical improvement, and concluded that no additional diagnostic studies or medical treatment was required. Dr. McCloskey provided plaintiff with a 15% permanent partial disability rating to the back, and released plaintiff from his care with a prescription for Lorcet for pain.
20. Dr. Knapp is an expert in the field of spine surgery and reviewed plaintiff's diagnostic studies ordered by Dr. McCloskey. This review did not change Dr. Knapp's opinions. Dr. Knapp's opinion as to plaintiff's condition and any need for additional treatment including the IME and diagnostic studies ordered by Dr. McCloskey, is given greater weight than any different opinion of Dr. McCloskey. Dr. de Percel also examined plaintiff and reported minimal weakness of plaintiff's lower extremities and assigned plaintiff a 15% permanent partial disability rating to plaintiff's back. Dr. de Percel's opinion regarding plaintiff's permanent impairment is given greater weight by the Full Commission.
21. Defendants have directed plaintiff's medical care in a prompt and adequate manner and have provided plaintiff with expert appropriate medical care through the initial physicians who evaluated and treated plaintiff and ultimately through Dr. Knapp. Dr. Knapp has provided plaintiff with competent and appropriate medical care including surgery, which significantly improved plaintiff's condition regardless of some residual symptoms. Furthermore, plaintiff was provided a second opinion with Dr. de Perczel as required by the Act and plaintiff did not experience any emergency requiring unauthorized medical treatment.
22. While plaintiff first made a request for additional medical treatment and diagnostic testing by verbally requesting an MRI from Bonnie Foster sometime during the year 2001, this request was prior to his second opinion on the rating with Dr. de Perczel, at which time no further testing was recommended. Thereafter, plaintiff did not request additional treatment after the second opinion with Dr. de Perczel until filing a request with the Commission on February 4, 2003 approximately 2 years and 2 months following Dr. Knapp's finding of maximum medical improvement and almost 2 years following plaintiff's second opinion on the rating with Dr. de Perczel. Plaintiff's motion was held in abeyance by order filed February 27, 2003 but addressed in part with a return visit to Dr. Knapp to assess plaintiff's current condition and by a hearing in this matter. However, plaintiff proceeded with an IME and diagnostic testing with Dr. McCloskey prior to a decision in this matter. Nevertheless, plaintiff's request for authorization for additional treatment was filed prior to his obtaining treatment. While plaintiff made a request for the additional treatment prior to receiving such treatment, plaintiff's actions to pursue treatment and diagnostic tests during June 2003 through December 2003 with a third physician, Dr. McCloskey, were unreasonable under the circumstances, in particular, considering that plaintiff was provided all reasonably necessary medical treatment and diagnostic testing with an expert spine specialist, Dr. Knapp, including a reevaluation by Dr. Knapp in April 2003 at which time no further diagnostic testing or treatment was reasonably necessary to effect a cure or provide relief and plaintiff underwent a second opinion with Dr. de Perczel.
23. Both Dr. Knapp and Dr. de Perczel were aware of plaintiff's residual complaints and felt that no further testing or medical treatment was needed. Dr. Knapp felt that even with residual symptoms plaintiff could not benefit from a fusion and that plaintiff was functioning at the medium level capacity, which could not be achieved by post-fusion patient. In fact, plaintiff continued to work full-time for defendant-employer since the date of his maximum medical improvement in November 2000. Finally, none of Dr. McCloskey's evaluations or testing revealed any additional information or need for medical treatment. Dr. McCloskey's treatment and diagnostic evaluations were unauthorized and unnecessary to confirm the recommendations and diagnoses of Drs. Knapp and de Perczel. To the extent that Dr. McCloskey, plaintiff or Ms. McDonald testified to the contrary, their testimony is provided less weight.
24. Plaintiff has been at maximum medical improvement since at least November 9, 2000 and his residual left extremity complaints have been fairly consistent since November 9, 2000. The Full Commission finds that plaintiff has sustained a permanent partial impairment of 15% to his back. Plaintiff has not suffered any substantial change in his condition related to the injury of April 28, 2000. Furthermore, plaintiff is not in need of additional medical treatment related to the April 28, 2000 injury other than over-the-counter pain medications as recommended by Dr. Knapp. In fact, considering the greater weight of the evidence of record including the medical evidence, plaintiff's complaints, and his activities, the IME and numerous diagnostic tests performed by Dr. McCloskey were not reasonably necessary to effect a cure or provide relief.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff is entitled to permanent partial disability compensation for a 15% permanent partial impairment to the back. N.C. Gen. Stat. §97-31(23).
2. Under the North Carolina Workers' Compensation Act, defendants generally have a right to direct medical treatment and the Act allows for medical treatment, which may reasonably be required to effect a cure or give relief. N.C. Gen. Stat. §§ 97-2(19); 97-25.
3. Plaintiff is not entitled to payment by defendants for the unauthorized medical treatment and diagnostic evaluations received from or directed by Dr. McCloskey as such treatment does not fall within one of the recognized exceptions to defendants' general right to direct medical treatment under the Act. Furthermore, the greater weight of the evidence indicates that the medical treatment and diagnostic testing provided by Dr. McCloskey was not reasonably required to effect a cure or provide relief. Schofield v. Tea Co., 299 N.C. 582, 264 S.E.2d 56 (1980); N.C. Gen. Stat. §§ 97-2(19), 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff permanent partial disability compensation for plaintiff's 15% permanent partial impairment to the back. Specifically, subject to an attorney's fee, defendants shall pay plaintiff thirty weeks of benefits, at the rate of $285.51 per week. Compensation due which has accrued shall be paid in a lump sum subject to attorney's fees hereinafter provided.
2. A reasonable attorney's fee of twenty-five percent (25%) of the compensation due plaintiff under Paragraph #1 of this award is approved for plaintiff's counsel and shall be deducted from the lump sum due to plaintiff and paid directly to plaintiff's counsel.
3. Plaintiff's motion for additional medical treatment including for payment of the IME, diagnostic tests and treatment with Dr. McCloskey is hereby DENIED.
4. Defendants shall bear the costs due the Commission.
This the ___ day of August, 2004
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING IN PART AND DISSENTING IN PART:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER